# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SETH SIEGLER,<br><br>         Plaintiff,<br><br> v.<br><br>CURB CALL, INC., *et al.*,<br><br>         Defendants. | Case No. 17-cv-01136-BAS-WVG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>**[ECF No. 14]** |

  Plaintiff Seth Siegler commenced this diversity action against Defendants Curb Call, Inc. and Stephanie Sullivan. Presently before the Court is Defendants' motion to dismiss Siegler's Complaint for failure to state a claim. (ECF No. 14.) Siegler opposes. (ECF No. 15.)

  The Court finds this motion suitable for determination on the papers submitted and without oral argument. *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1). For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss.

## I. BACKGROUND

### A. The Asset Purchase Agreement

On January 25, 2016, two similarly-named corporations entered into an Asset Purchase Agreement—Curb Call Technologies, Inc. and Defendant Curb Call, Inc. ("Company"). (Asset Purchase Agreement ("APA"), Mot. Ex. A, ECF No. 14-2.[1]) Under this agreement, Curb Call Technologies agrees to sell various assets to the Company, including mobile device applications, website domain names, and intellectual property rights. (*Id.* § 1.1.) In return, the Company promises to compensate shareholders of Curb Call Technologies with a combination of cash payments and shares of the Company's common stock. (*Id.* § 1.6.)

As one of these shareholders, Plaintiff Seth Siegler is a third-party beneficiary to the Asset Purchase Agreement. The Company promises to provide him with $270,000 in cash and 750,000 shares of its common stock. (APA § 1.6(a)(i)(A), (a)(ii)(A).) The Company further agrees to pay Siegler the cash consideration "at the time set forth on Schedule 1.6(a)" of the Asset Purchase Agreement. (*Id.* § 1.6(a)(i)(A).) This schedule provides:

> The Cash Price payable to Siegler shall be paid upon payment terms to be reasonably agreed upon between [the Company] and Siegler, but unless modified by any agreement between [the Company] and Siegler, payment shall be made in monthly installments not to exceed a 12 total payments, with the first payment made 30 days after the final payment to the [other stockholders of Curb Call Technologies].

---

[1] Courts usually may not consider material outside the complaint when ruling on a motion to dismiss. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). However, the "incorporation by reference" doctrine permits the court "to take into account documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'" *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (alteration in original) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)). The Asset Purchase Agreement is referenced repeatedly in Siegler's Complaint and the parties' two separate agreements attached to the pleading. (Compl. ¶¶ 9–10, 12, Exs. A, B.) No party questions its authenticity. Hence, although Siegler does not attach the Asset Purchase Agreement to his Complaint, the Court considers the contents of this agreement when ruling on Defendants' motion to dismiss. *See, e.g.*, *Knievel*, 393 F.3d at 1076.

(*Id.* Sched. 1.6(a).) This lawsuit revolves around the cash payment promised to Siegler and the parties' efforts to modify this payment obligation in two subsequent agreements.

### B. The Repayment and Forbearance Agreements

Following the execution of the Asset Purchase Agreement, Siegler alleges he "agreed to enter into two separate agreements, which altered the payment scheme under the Asset Purchase Agreement." (Compl. ¶ 10, ECF No. 1.) He did so "at Defendants' express request to assist [the Company] with certain financial issues." (*Id.*)

These two agreements—the Forbearance Agreement and the Repayment Agreement—were made effective on the same day: June 17, 2016. (*See* Forbearance Agreement, Mot. Ex. B, ECF No. 14-3; Repayment Agreement, Mot. Ex. C, ECF No. 14-4.) The Court will first discuss the Repayment Agreement. The parties to this agreement are the Company, Siegler, and Defendant Stephanie Sullivan, the Chief Executive Officer ("CEO") of the Company. The agreement initially recites that the Company owes Siegler money "pursuant to that certain Asset Purchase Agreement (the 'APA')." (Repayment Agreement Recitals.) CEO Sullivan then promises:

> to make all payments to Siegler due under the APA in place of the Company in the amounts and at the times such payments are due to him pursuant to the APA such that he receives payments from Sullivan at the times and in the amounts that he would have received them from the Company in the absence of this Agreement.

(*Id.* § 1.) In return, Siegler "assigns to Sullivan all rights to receive each payment due to him from the Company when such payments become due and payable pursuant to this Agreement." (*Id.*)

The same parties—the Company, Siegler, and CEO Sullivan—entered into the Forbearance Agreement. In this agreement, the parties recite that the Company has two payment obligations. First, it owes money to CEO Sullivan "under a series of

promissory notes." (Forbearance Agreement Recitals.) Second, the Company "owes certain amounts to Siegler pursuant to that certain Asset Purchase Agreement (the 'APA') between the Company and Curb Call Technologies, Inc." (*Id.*) Next, the parties agree that Siegler and Sullivan will forbear enforcing these payment obligations. (*Id.* § 1.) That is, they "agree to refrain from demanding payment . . . on any [Promissory] Note and to refrain from enforcing rights to payment under the APA, and the Company agrees to not pay any amounts due under" these items, until one of a series of triggering conditions occurs. (*Id.*) These conditions include the Company completing a public stock offering or the Company merging with another entity. (*Id.* § 1.1–1.5.) It is not clear whether this agreement was entered into before or after the Repayment Agreement.

### C. Siegler's Claims

Following these agreements, Siegler alleges "Defendants made six monthly payments of $22,500 prior to December 2016, plus a single payment of $30,000 in February of 2017." (Compl. ¶ 14.) However, "Defendants did not make the regular monthly payment in December 2016, and missed all subsequent monthly payments [after February 2017]." (*See id.*) Thus, Siegler claims "Defendants have paid $165,000 on the principal debt [of $270,000] and owe $105,000, without including interest, penalties or late fees." (*Id.* ¶ 15.)

Accordingly, Siegler now brings suit to obtain the remainder of the $270,000 cash payment promised to him under the Asset Purchase Agreement. He first brings a claim for breach of the Repayment Agreement against both Defendants. (Compl. ¶¶ 8–18.) In the alternative, Siegler sues the Company for unjust enrichment. (*Id.* ¶¶ 19–26.) He alleges he "conveyed certain assets to" the Company, (*id.* ¶ 20), and "it would be unjust or unfair to allow [the Company] to retain the assets without paying their value," (*id.* ¶ 19). Defendants move to dismiss, arguing Siegler's causes of action fail to state a claim upon which relief may be granted.

## II. LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims asserted in the complaint. *Navarro v. Block*, 250 F.3d 729, 731 (9th Cir. 2001). The court must accept all factual allegations pleaded in the complaint as true and must construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations; rather, it must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (alteration in original). A court need not accept "legal conclusions" as true. *Iqbal*, 556 U.S. at 678. Despite the deference the court must pay to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts that [he or she] has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

As a general rule, a court freely grants leave to amend a complaint that has been dismissed. Fed. R. Civ. P. 15(a); *Schreiber Distrib. Co. v. Serv-Well Furniture*

*Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). However, leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co.*, 806 F.2d at 1401 (citing *Bonanno v. Thomas*, 309 F.2d 320, 322 (9th Cir. 1962)).

### III. ANALYSIS

#### A. Breach of Contract

The Court will apply Delaware law to Siegler's claims.[2] "Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages." *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. Ct. 2005). The Court will assess whether Siegler sufficiently alleges that these elements are satisfied for each Defendant.

##### 1. The Company

Siegler alleges the Company is obligated to make payments to him under the Repayment Agreement, but it has failed to do so. (*See* Compl. ¶¶ 13, 17.) Defendants

---

[2] All of the contracts at issue provide that they "shall be governed by, and construed in accordance with, the laws of the State of Delaware." (APA § 6.6, Forbearance Agreement § 6, Repayment Agreement § 4.) To determine whether this contractual choice-of-law is effective in this diversity action, the Court applies the choice-of-law rules from the forum state—California. *See, e.g.*, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

Under California's approach, which is adopted from section 187 of the Restatement (Second) of Conflict of Laws, the Court must determine: (1) whether the chosen state—Delaware—has a substantial relationship to the parties or their transactions, or (2) whether there is any other reasonable basis for the parties' choice of law. *See, e.g.*, *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 465–66 (1992). The first option is satisfied here because the Company is incorporated in Delaware. *See id.* at 467. Further, no party disputes the validity of the contractual choice-of-law. The Court also notes that Siegler's unjust enrichment claim is closely related to the three contracts at issue. Thus, the Court will apply Delaware law to Siegler's claims. *See id.* at 470 ("[A] valid choice-of-law clause . . . encompasses all causes of action arising from or related to that agreement.").

argue this claim is defective because the Repayment Agreement does not require the Company to make any payments to Siegler. (Mot. 4:7–5:1.) The Court agrees.

The proper construction of a contract is a question of law. *E.g.*, *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). In interpreting a contract, the court "give[s] priority to the intention of the parties." *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009). To determine the parties' intent, the court first examines "the four corners of the contract to conclude whether the intent of the parties can be determined from its express language." *Id.* at 145. If the contractual language at issue "is clear and unambiguous," it must be accorded "its plain meaning." *Phillips Home Builders, Inc. v. Travelers Ins. Co.*, 700 A.2d 127, 129 (Del. 1997).

The Company promised to pay Siegler $270,000 in the Asset Purchase Agreement. (APA § 1.6(a)(i)(A).) But Siegler is not suing for breach of this agreement. He claims the Company breached the parties' subsequent Repayment Agreement. (*See* Compl. ¶ 17.) This claim fails, however, because Siegler does not sufficiently allege that the Company owes him a contractual obligation under the Repayment Agreement. In fact, this agreement demonstrates Siegler relinquished the right he obtained in the Asset Purchase Agreement to receive payment from the Company. The Repayment Agreement recites that Siegler "desires . . . to assign his rights to the" money he is owed under the Asset Purchase Agreement to CEO Sullivan. (Repayment Agreement Recitals.) Then, in exchange for CEO Sullivan's promise that she—in lieu of the Company—will personally make Siegler the payments he is owed, Siegler "hereby assigns to Sullivan all rights to receive each payment due to him from the Company . . . ." (*Id.* § 1.)

This provision effected an assignment. "An assignment is a transfer of a contractual right to performance by the obligor from the assignor to the assignee." *Imo Indus. Inc. v. Siemens Demag Delaval Turbomachinery, Inc.*, No. Civ.A. 20142, 2005 WL 1138807, at *3 (Del. Ch. May 4, 2005) (emphasis omitted). Siegler

transferred to CEO Sullivan his contractual right under the Asset Purchase Agreement to receive payments from the Company. Consequently, he does not now have the right to receive performance from the Company—CEO Sullivan does. *See, e.g.*, Restatement (Second) of Contracts § 317 (1981) (providing an assignment extinguishes "the assignor's right to performance by the obligor . . . in whole or in part and the assignee acquires a right to such performance"). Siegler therefore does not adequately allege the Company owes him "a contractual obligation" under the Repayment Agreement, the second element of a breach of contract claim under Delaware law. *See Interim Healthcare*, 884 A.2d at 548.

Further, the Court is unmoved by the arguments Siegler raises in his opposition with respect to this claim. Siegler does not persuasively explain why his Complaint's allegations should overcome the assignment provision in the Repayment Agreement. *See, e.g., Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998) (noting the court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint").

Accordingly, because Siegler's claim against the Company for breach of the Repayment Agreement lacks plausibility, the Court will dismiss it with leave to amend. *See* Fed. R. Civ. P. 15(a); *see also, e.g., Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011).

### 2. CEO Sullivan

Siegler's Complaint lumps CEO Sullivan and the Company together, generally referring to both parties as "Defendants" throughout. (*See* Compl. ¶¶ 8–26.) Thus, although his pleading lacks precision, Siegler similarly alleges that CEO Sullivan is obligated to make payments to him under the Repayment Agreement, but she has failed to do so. (*See id.* ¶¶ 13, 17.)

This claim hinges on CEO Sullivan's promise to personally pay Siegler in the Repayment Agreement. (*See* Repayment Agreement § 1.) The parties present

competing interpretations of this payment obligation. In Defendants' view, CEO Sullivan assumed the Company's obligation to pay Siegler $270,000—but only as that obligation was modified by the parties' separate Forbearance Agreement. (Mot. 7:2–8:8.) Thus, they believe CEO Sullivan is not required to make any payments to Siegler until one of the triggering conditions in the Forbearance Agreement is satisfied—*e.g.*, the Company completes a public stock offering. (*Id.*) And, because Siegler's Complaint does not allege that one of these conditions has occurred, Defendants argue the Forbearance Agreement bars Siegler's demand for payment from CEO Sullivan. (*Id.*)

Siegler presents a different interpretation. He argues the Repayment Agreement created an obligation for CEO Sullivan "to pay as required under the original schedule of the Asset Purchase Agreement." (*See* Opp'n 6:4–6.) That is, CEO Sullivan is "obligated to make twelve payments of $22,500 to Siegler, due on a monthly basis, for a total amount of $270,000." (*See* Compl. ¶ 13; *see also* APA Sched. 1.6(a).) Further, he argues this interpretation is bolstered by his allegations concerning the parties' course of performance. The parties entered into the Repayment Agreement and the Forbearance Agreement in June 2016. Siegler alleges six payments of $22,500 were then made to him "prior to December 2016, plus a single payment of $30,000 in February of 2017." (*See* Compl. ¶ 14.) He contends this course of performance is "proof" that the parties' "understanding at the time of executing the contracts" aligns with his argued-for interpretation of the Repayment Agreement and "refutes the alternative interpretation [Defendants] now propose." (Opp'n 2:10–11.)

As mentioned, contract interpretation under Delaware law starts with examining the four corners of the contract. *Paul*, 974 A.2d at 145. The inquiry ends if the language "is clear and unambiguous." *Phillips Home Builders*, 700 A.2d at 129. If there is ambiguity, however, the court must consider additional rules of contract interpretation. *E.g.*, *Rhone-Poulenc*, 616 A.2d at 1196. A contract is not

ambiguous merely because the parties disagree about its proper interpretation. *Id.* "Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Id.*

"When the terms of an agreement are ambiguous, 'any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.'" *Sun-Times Media Grp., Inc. v. Black*, 954 A.2d 380, 398 (Del. Ch. 2008) (quoting Restatement (Second) of Contracts § 202 (1981)); *see also* Restatement (Second) of Contracts § 202 cmt. g (1981) ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."). Further, when adjudicating a motion to dismiss, a court "cannot choose between two differing reasonable interpretations of ambiguous documents." *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996); *accord, e.g.*, *Westlands Water Dist. v. U.S. Dep't of Interior, Bureau of Reclamation*, 850 F. Supp. 1388, 1408 (E.D. Cal. 1994) ("A motion to dismiss cannot be granted against a complaint to enforce an ambiguous contract." (citing *Consul Ltd. v. Solide Enters., Inc.*, 802 F.2d 1143, 1149 (9th Cir. 1986))).

In this case, there is ambiguity in the Repayment Agreement's payment provision. The payment provision is not clear as a matter of law as to how it interacts with the parties' separate Forbearance Agreement. Namely, the Repayment Agreement does not make clear whether the parties intended to: (a) simply incorporate the monthly payment schedule contained in Schedule 1.6(a) of the Asset Purchase Agreement, with CEO Sullivan now personally making these payments as scheduled; or (b) incorporate the payment obligation from the Asset Purchase Agreement, as separately modified by the limitations in the Forbearance Agreement, which would mean CEO Sullivan is not obligated to make the scheduled payments until one of the conditions under the Forbearance Agreement occurs.

There is support in the legalese payment clause for either conclusion. It provides CEO Sullivan will pay Siegler the payments due under the Asset Purchase Agreement "such that he receives payments from Sullivan at the times and in the amounts that he would have received them from the Company in the absence of this Agreement." (Repayment Agreement § 1.) A variation of the phrase "at the times and in the amounts" is also found earlier in the clause. (*See id.* (providing CEO Sullivan will make the payments "in the amounts and at the times such payments are due").) This language suggests CEO Sullivan is promising to now make the payments "at the times and in the amounts" provided in Schedule 1.6(a) of the Asset Purchase Agreement. This schedule is the only portion of the various agreements that describes the "time and amounts" for Siegler to be paid. It provides for "monthly installments not to exceed a 12 total payments," *i.e.*, $22,500 a month for 12 months, for a total of $270,000. (*See* APA Sched. 1.6(a).)

On the other hand, the payment clause states CEO Sullivan will pay Siegler the amounts he is owed "due under the APA" and "pursuant to the APA." (Repayment Agreement § 1.) Further, in the Forbearance Agreement, Siegler and CEO Sullivan agree to "refrain from enforcing rights to payment under the APA, and the Company agrees not to pay any amounts due under the [APA]," unless one of the triggering conditions occurs. (Forbearance Agreement § 1.) Thus, if the Forbearance Agreement is viewed as modifying the Company's payment obligation, which CEO Sullivan merely then assumed in the Repayment Agreement "pursuant to the APA," arguably CEO Sullivan does not need to pay Siegler while the Forbearance Agreement is in effect. And, as mentioned above, it is not clear which agreement was entered into first.

When the Court expands the inquiry to include additional rules of contract interpretation to resolve this ambiguity, Siegler's claim is further supported by the parties' alleged course of performance. Accepting as true Siegler's allegation that he received a series of payments after the agreements were entered into, this "course

of performance" is "given great weight" and supports Siegler's interpretation of the Repayment Agreement. *See Sun-Times Media Grp.*, 954 A.2d at 398. This conduct indicates the parties intended in the agreement for Siegler to receive the payments "at the times and in the amounts" provided in Schedule 1.6(a) of the Asset Purchase Agreement. (*See* Repayment Agreement § 1.) That being said, this issue will not be resolved at the motion to dismiss phase. Siegler's Complaint contains sufficient allegations to plausibly plead that: (1) CEO Sullivan agreed to pay him under the Repayment Agreement, (2) CEO Sullivan breached this obligation by missing scheduled payments, and (3) Siegler has suffered harm. The Court accordingly denies Defendants' motion to dismiss Siegler's breach of contract claim against CEO Sullivan.

### B. Unjust Enrichment

Siegler also brings a claim for unjust enrichment against the Company. Under Delaware law, "[u]njust enrichment is defined as the unjust retention of a benefit to the loss of another or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Shock v. Nash*, 732 A.2d 217, 232 (Del. 1999). It requires: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law. *U.S. Bank Nat'l Ass'n v. Gunn*, Civ. No. 11-cv-1155-RGA, 2015 WL 4641611, at *5 (D. Del. Aug. 5, 2015).

Before reaching the elements of an unjust enrichment claim, a court must satisfy itself that no contract already governs the relevant relationship between the parties. Where the complaining party has a legal remedy by virtue of a contract with the party alleged to have been enriched, "the contract remains 'the measure of [the] plaintiff's right.'" *MetCap Secs. LLC v. Pearl Senior Care, Inc.*, No. Civ. A. 2129-VCN, 2007 WL 1498989, at *5 (Del. Ch. May 16, 2007); *see also Kuroda v. SPJS*

*Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009) ("A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim."). In some situations, an unjust enrichment claim may survive a motion to dismiss when pled as an alternative theory, but that does not eliminate the need for the plaintiff to provide sufficient factual allegations to support the claim. *See BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, No. 20456, 2009 WL 264088, at *7–8 (Del. Ch. Feb. 3, 2009).

Siegler's unjust enrichment claim against the Company is not plausible. Initially, the three contracts summarized above govern the relevant relationship between Siegler and the Company that gives rise to this claim. Therefore, provided the contracts are valid—which Siegler does not contest in his Complaint—he cannot maintain this claim. *See, e.g.*, *Kuroda*, 971 A.2d at 891.

Further, even if allowed to plead this claim as an alternative theory, Siegler does not provide sufficient factual allegations to support his unjust enrichment claim. To pursue this claim on an alternative theory, Siegler needs to also plead facts showing that the relevant agreements are unenforceable and that there is an independent basis for the unjust enrichment claim. *See, e.g.*, *BAE Sys. Info. & Elec. Sys. Integration*, 2009 WL 264088, at *7–8. His pleading does not satisfy this requirement. It recites the elements of an unjust enrichment cause of action, but little else. (*See* Compl. ¶¶ 20–26.) This showing is inadequate to survive a motion to dismiss in these circumstances.[3]

---

[3] The Court notes that it would reach the same result under California law. *See, e.g.*, *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1389 (2012) (providing that although plaintiffs may plead inconsistent claims that allege both the existence of an enforceable agreement and the absence of one, the plaintiffs could not pursue "a quasi-contract claim under the theory of unjust enrichment" where their "breach of contract claim pleaded the existence of an enforceable agreement and their unjust enrichment claim did not deny the existence or enforceability of that agreement").

Finally, as presently pled, Siegler's unjust enrichment allegations conflict with the Asset Purchase Agreement, a document that his Complaint relies upon. In his unjust enrichment claim, Siegler alleges he "conveyed certain assets to [the Company]." (Compl. ¶ 20.) His Complaint then describes the assets conveyed by the Asset Purchase Agreement. (*See id.*; *see also* APA § 1.1.) But this agreement shows a separate entity, Curb Call Technologies, Inc.—not Siegler—conveyed these assets to the Company. (*See* APA Recitals, § 1.1.) Hence, this agreement indicates Curb Call Technologies—not Siegler—is the one that could potentially bring a claim for unjust enrichment against the Company. In light of the foregoing, Siegler needs to plead additional facts demonstrating or explaining how he personally enriched the Company. *See Steckman*, 143 F.3d at 1295–96 (noting the court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint").

Accordingly, because Siegler does not state a plausible claim for unjust enrichment against the Company, the Court will dismiss his second claim with leave to amend. *See* Fed. R. Civ. P. 15(a); *see also, e.g.*, *Cafasso*, 637 F.3d at 1058.

## IV. CONCLUSION

In sum, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss (ECF No. 14). The Court grants Defendants' request to dismiss Siegler's breach of contract claim against Defendant Curb Call, Inc. The Court dismisses this claim with leave to amend. The Court, however, denies Defendants' request to dismiss Siegler's breach of contract claim against Defendant Stephanie Sullivan. Last, the Court grants Defendants' request to dismiss Siegler's unjust enrichment claim against Defendant Curb Call, Inc. This claim is also dismissed with leave to amend.

//
//

If Siegler chooses to file a First Amended Complaint, it must be filed no later than **January 16, 2018**.

**IT IS SO ORDERED.**

DATED: December 29, 2017

Hon. Cynthia Bashant
United States District Judge